Case of the day, 4-15-0081, in re the marriage of Laurie Bushert, now known as Van Lannan, and Bruce Bushert. Let's see, Attorney Reed is here on behalf of the appellant. Attorney Cromwell? Yes. Okay, is here on behalf of the affilee. Mr. Reed, are you ready to proceed? I am. You may do so. Thank you. Good afternoon, Your Honors. Good afternoon. You know, initially I'm cognizant of the fact that all of you have read the briefs. So I'm going to try and highlight what I think the trial court, where the trial court was in error. And the first thing that I'd like to draw the court's attention to is I don't believe the trial court properly followed the holding in Callen-Gordon, which is, it looks like the most recent Supreme Court case that is on all fours here. And in that, here's where I want to draw your attention to. The trial court made this statement in its findings. And that statement is, the move may enhance the petitioner's quality of life, referring to Ms. Van Lannan, but not the children. And that's a statement that the trial court made that is just inconsistent with Callen-Gordon. Callen-Gordon specifically addresses that issue and says that even if there's no direct benefit to the children, there's an indirect benefit as a result of, in this case, Ms. Van Lannan's improved, happier life. But doesn't Callen-Gordon stand for the proposition that a court may find that even if there isn't a direct benefit to the child, the benefits to the parent may weigh in favor of the move, but not that if it is going to benefit the parent, then we have to allow it? No, no, I don't think you have to. I think all these cases are factually dependent, each one of them. And if I, I'll just get right to that. If you look at the facts of this case, that is what is most beneficial, I think, to Ms. Van Lannan's argument. We've got a case here where other cases say you can't chain a person to the state of Illinois, for example. And what you said is absolutely correct. It doesn't mean you have to allow this person to move. But once she establishes a legitimate reason for wanting to move, then we need to look into all of these other factors. And I believe she did establish a legitimate reason for wanting to move. She remarried in 2012. And she, in fact, didn't ask to move until 2014. So she's been doing this travel from Wisconsin to Illinois. It's about a five-hour drive. Not only since she's married, but prior to that, because she's got family in Wisconsin. I'm kind of skipping around here as these things come up, but they've always traveled, the kids, that is. But more directly to your question, the facts in this case show that she's from Wisconsin. These parties actually married in Wisconsin. Everything was in Wisconsin. Then they moved to the Decatur, Illinois area, Monroe-Forsyth School District, and lived there as a couple. They're no longer a couple. Mike Klein is remarried. He's with a girlfriend he's been with a year and a half. And he's still in that area because his business is in that area. But Mike Klein has married a man who's from her hometown, where she was born, where she grew up, where her parents are, where her siblings are, where his entire family is. So what we have in this case is a factual scenario where we either have mis-found land and live in Decatur with her two children, without the benefit of her husband, with no family support system, in two separate households. On the other hand, if we allow her to go to Wisconsin, she's under one roof, living with her husband, in just as good of a school district as she has in Monroe-Forsyth. I mean, those are the two choices. And what I'm suggesting to the court is these particular facts would suggest, under Collingboard, and some of the cases this court has looked at, Eaton and Shaddle and various others, that in this particular factual scenario, it would be in the children's best interest to move with their mother to Wisconsin. Because what we have here is we're forcing mom to either not live with her husband and stay in the Decatur area, or move to Wisconsin without her kids. And we've already established, the trial court has already established, that she's the proper custodial parent. And when you look at the facts of this case, even the arguments, everybody, both sides, agree that she did and does everything for these kids. This isn't a situation where you've got mom and dad both parenting. She's doing everything. When I say everything, doctor's appointments, dentist appointments, extracurricular activities, making their lunches, taking them to get haircuts, when they're sick, they come to her. Some of the things you need to look at are, in one year, dad missed 29 overnights. In one year, dad missed 87 out of, not one year, but over a period of time, dad missed 87 out of 93 of the kids' extracurricular activity events. Almost all of them. Well, counsel, let me ask you this, because I guess, in my view, it's a close case, and given the standard of review comes into play. But another thing, in the Shadow case, it was made clear that mom was going to leave without the kids. Was that discussed at all in this case as far as, well, if she can't move with the kids, then she's going to leave without the kids? Was that ever an issue in this case? Never an issue. But that was touched upon. That's one of the things I was going to draw this court's attention to, a statement that the trial court made. It was improper, and it relates directly to that issue. And I'll get right to that. It's in your brief. It is. Do you know what I'm talking about? I assume I do. Okay. When was the commitment ceremony? No, here's what the court said. I'm somewhat taken aback by her position that if this is denied, I'm just going to move.  That is not what she said. The trial court made that statement in its findings. Now, here's what she actually said. She was asked the question, what are you going to do if this thing is denied? And here's what she said. She says, this is a quote in Volume 6, page 122. My hope is somehow to get closer to my family, yes. This is in response to the question, what if I deny it? My hope is to somehow get closer to my family, yes. And I would definitely be selling the huge house in Maroa. It's just too much upkeep. In response to the question, you're going to no matter what, in other words, move, she says, I believe that's how the law works. Meaning, move further in Illinois. Yeah, I thought I read somewhere that she basically said she would move to the Chicago area to be closer. The court said that. So she didn't say that? She didn't say that. Okay. What she said was, I'm going to move as close as I can up in that area. You know, I don't want to misstate anything. I don't recall her saying exactly that. But basically what she was saying was, it was my understanding of the law that I can move as far as I can in Illinois. My Maroa house is too big. So yeah, naturally I'd want to get as close as I can to my family. That's what she said. She wasn't thumbing her nose and saying, I don't care what you say. It wasn't like that at all. But that's the way it came across in the trial court's decision. So when you say it's a close case, that's why I want to highlight these things that I feel the trial court did improperly. And the first one was what I said about not following Collingborg and making the statement, the move may enhance the petitioner's quality of life but not the children. To me, that's just blatantly not what Collingborg says. And then he doesn't go on to say why. That's the point I'm making. He doesn't go on to say, well, here's why it doesn't enhance the quality of the children's lives. He doesn't say that being able to live in one household with your husband would necessarily make you happier, enhance your quality of life, which would necessarily enhance the quality of life of your kids, that her entire family is from that area, that she'll be a happier person by living under one roof. The next thing that the court says that I want to draw your attention to is that, well, these are inconsistent statements, but it goes back to the facts of this case, and that is that mom's the day-to-day person. Here's what the court says. Father was working longer hours in his business to provide an affluent lifestyle for the family and was not involved in many of the day-to-day routine matters involving the children. And later on, the court says that he was involved in the routine matters, but he wasn't. And I think that's important here, because this is a mother who does everything for these kids. And since we've given her the opportunity, we've already determined that she's the proper custodian, then we've got to give, I think Eaton says, great deference is the word, give great deference to her determination to remarry and to relocate, that that is in the best interest of her kids. We have to give that great deference, I think, is the wording that this court has used in Eaton. I think I wrote Eaton. Okay. And the facts of that case are significantly different. Okay. In terms of the Eaton family had already moved a number of times to benefit the father without that necessarily benefiting the family. If I'm thinking of the right case. Is this Quincy and Florida, that one? Yeah. Okay. Quincy and Florida. Uh-huh. And the mother was not only the custodian, but had shown judgment in many instances which were such that the deference ought to be given to her. I'm not saying that's not also the case here. Right. But the facts are a lot different. So picking out language from Collingborn or picking out language from Eaton is helpful to establish the outside boundaries or the things that might guide us. But this is pretty fact specific. I think in these cases... It is. You said that with these cases. Absolutely. Absolutely. And obviously it's my job to highlight for you the things that I think are going to help you or help us. Does the father live in the school district where the children attend? I believe he does. To me, this case seems to me like if the parties had talked about maybe working some arrangement out so that from Friday through Monday he has the children and takes them into school, she could travel up to Wisconsin and be with her husband on the alternate weekends and the children would be able to travel every weekend. And then if she chose to go home on the weekends, she had the children, she could. But, I mean, here you have children who are established in school. They have their friends and fathers here. They have a nice home. I think the trial judge found the home was comparable. The school districts were somewhat comparable also. So you have also the testimony of at least one of the children that they didn't really want to go. Right. I mean, that's prevalent in almost all of these cases if you look at them. In almost every case, the kids don't want to move. But that's a natural reaction. I wouldn't want to move when I was that age. No kid is going to want to move. But that's prevalent in almost every one of these cases. I've highlighted it. They all say that. Kids never want to move. But this court in Shaddle, I don't know if you wrote that opinion too, but in Shaddle, here's what this court said. Again, I'm pulling something out of this. It says a removal would rarely be granted if the court only considered direct benefits to the children who live in a good environment with good schools, good parents, and good friends. So, I mean, really, if we were just looking at do the kids want to move and are they in a good environment already, we'd never grant removal. I mean, rarely in those situations we had good schools, good environment, good friends.  These guys are, I think, 11 and 6. Naomi is now 7. She was 6 at the time. And I think Ms. Van Lannan's wisdom in waiting to file this, she didn't want to file it when they got divorced. Her testimony was there was too much going on. She didn't want to upset the kids. And she wanted Alyssa, the oldest daughter, to finish high school, did all that, then filed this in July of 2014. And backing up in the joint parenting agreement, she had a provision inserted in there that said it is currently, they put that word in there, and Mr. Buschert said, yeah, I finally gave in on that, currently in their best interest to go to the Moroso-Forsyth School District. And he said, I gave in to that. Was that because he didn't want the currently in there? Right. He said he didn't want the currently in there. He just didn't want her to be able to move at all while the children were still underage. Probably that would be his position. But she was saying and said all along, at some point I want to try and move to Wisconsin, and that's why she wanted that word in there. But I'm just showing that she had the kids' best interest at heart. She didn't try and move them right away. She waited almost two years with the kids' best interest in mind. A couple of other things that the court said. It said the travel will include longer hours in cars. That's not accurate. The court made that finding. Lori's testimony actually was that the travel would be decreased in terms of trips, according to her reasonable and realistic visitation schedule that she set forth, that the court didn't consider at all or talk about at all. All the court said was, I don't think planes are a good idea, and the travel is going to include longer hours in the cars, and that's just factually not accurate. And he based his finding on that. The kids have always traveled to and from. If you've got a husband, Lori, in Wisconsin, the kids are going to keep traveling to and from. They've got family. They've got grandmother, grandfather, cousins in Wisconsin. The travel between Illinois and Wisconsin will be no matter what. This court does. It actually will be less if her petition is granted, according to her testimony. It will go to 15 trips a year to 12 trips a year. That was her testimony in terms of the kids traveling. The court, when you started, Your Honor, White, to ask me earlier about the two questions the court asked Lori, two questions all the court asked her. What was the date of your commitment ceremony? And when did you buy the Wisconsin home? In other words, you already did all this. Now you're asking me to put a blessing on it. At least that's the way I read it. And I think that the court is, in effect, punishing her for putting the cart before the horse. That's my reading of it. And then with the comment that I'm somewhat taken aback by her position, that it's not, I'm just going to move. That's not really if you look at what she said at all. She was asked that question. She said, well, it's my understanding of the law that I've got to stay in Illinois. But my house in Decatur is too big, so I'm getting rid of it. And if I've got to move, then I'd like to move as close to my family as I can. That's what she said in her comments. In any event, I believe that the particular facts of this case being that she's from Wisconsin, her parents are from there, kids have cousins there, her husband's family is there, she's got a residence there. Did they travel to Wisconsin that often before the marital discord? I think that Ms. Van Lanta's testimony was about once a month. You made the point that she wanted to move back to where she lived. Right. But the children have lived their entire life here. Yes, they have, which is six years and 11 years. Well, I give credit regarding the graduation from high school, but that child as well had lived her entire life here. Yeah, that's true. Well, how does a trial court balance that? Well... So you're involving two or three people if we think about the older child, though I understand that's not relevant anymore. The older child lives in California. But these two children, I mean, there's always going to be an argument on the other side. Sure. Nothing that I can do about that. But how do you balance that? Well, you do, you have to balance that. And the balancing effect is these kids are young enough to adapt. I mean, with the six-year-old, you haven't even really started school yet. So that person's going to have some time to adapt, and I think several of these cases point to that effect, that kids of this age can adapt, at least in my opinion. I mean, as I'm writing this brief and thinking of these circumstances, it is. It's one or the other. But in this particular case, to me, allowing this mother custodial parent to move north and be with her husband in one household outweighs the disruption that's going to be caused to the children at this age. They are going to be disrupted. But what Lori pointed out in her testimony was, for example, she doesn't necessarily think it's the school, it's the parent, it's the parenting that allows these kids to be successful and do well in school and where they are. Meaning, yeah, I'd like to take them with me and live back where I'm from, and they'll do just as well there. In fact, they've already got friends there because they go to Wisconsin so often. She specifically named three friends that they have in Wisconsin. But the 11-year-old, I think she'll be 11 in November, didn't she say she didn't have any friends there? I think she might have said that. Yeah, she may have said that. And she was the one that told the GAL she didn't. She didn't say, I want to stay with Dad. She said, I want to stay with my friends. And to me, that shouldn't be the standard. It ought to be, overall, where are these kids going to be better off? And if I look down the road, hopefully that would be in Wisconsin. A year from now they'd have all new friends, and that's where they're going to stay. Still seeing their dad just as much. He's not a day-to-day guy, so he can't really argue that, nah, I'm not seeing him day-to-day anymore because he doesn't now. With her visitation schedule, he's going to see him just as much. And my point is the trial court didn't even consider that, didn't even discuss it. So I think the trial court, in this particular case, has made obvious errors in its decision and statements that are contrary to the law. So to me, not only is this based on facts, but it's also based on the evidence or the ruling that is improper. I think it's improper. And I'm not, again, this is my reading of it, and I have no idea because I haven't been in front of this judge, but it just seems to me that as I got into this and started reading the cases myself, that this particular judge maybe wasn't completely aware of all of the cases, what was out there and what he should have been looking at, what his order needed to include. All right, you'll have more time on the rebuttal list for me. Thank you. You're welcome. Mr. Thompel. May it please the court, counsel. Normally when you're the appellee, you have kind of an argument to go on, and then once you hear the argument, you get off that. I want to point out some things here. Judge Cory Hale does know the law, and we did address Ecker and those cases. I want to point out a few things that Mr. Reed said, that first with regard to Collingborn, he disregarded it. I don't think that's correct. I think that that's his argument, and it's an assumption. We don't know what the court fully considered. We know that he made an order. But I can tell you that when reading this order, you look at Eckert factors, and it's consistent with the Eckert factors. I mean, you go through. We're talking about best interest of the children. I want to point that out, best interest of the children. All I hear in the appellate's brief, his reply brief, and his argument, is Lori, Lori, Lori, Lori, Lori being with her husband. Her husband has family out there. They have cousins. It's not blood cousins. These are step cousins. Now, I'm not saying that that can't be family, but they have blood relatives here. Aren't her parents up there? I believe her parents are, but I think they were talking about, we were talking about friends, and he mentioned cousins. And that's what I think Justice Connect said, was don't they have friends, you know, they have friends here, but one of them said not up there, and I think that's accurate. So. Mr. Fanbell, I wanted to ask you this though. If it's true, and I assume it is, that your client was busy with his career, he worked long hours and I guess traveled some or whatever, and she was the primary caretaker of the children during the marriage, and he's been very busy in his career, and attended some extracurricular activities throughout the course, but not everyone, and didn't go to the doctor appointments and all that. What's his objection? Because according to Mr. Reed, they've agreed he could have as much or more visitation than he's had now with the children. And it's not like they're going to California, where it's going to be difficult to get to them. They're going to Wisconsin if they're allowed to. Well, the difference, I believe, is this. First of all, they tried to paint him as a detached father. That just wasn't true. Other than me and Ms. Van Lannen, we're the only two that were in the room when the trial was held. And he was active. He was involved in... I'm not questioning that. I believe he loves his children, he's been active in their lives, but he was busy with his job. That's correct. And she was the primary caretaker. And that's true. And right now he's seeing them every other weekend, isn't he? I may point out that the record reflects that he hired two new employees some time ago, years ago, to cut down on his travel. He very seldom travels now. There is an exhibit in the record with regard to his travel schedule. He testified that he is there. He's not working the long hours. He's built his company. He's not working those long hours. He's hired two people to do the traveling, to do that. What's his scheduled visitation right now? Your Honor, I'm sorry, I can't tell you that. I don't have that at the tip of my tongue. I'm sorry. Do you know if he gets them at all during the week? Yes, he does. Yes, he does. And I think it's a Tuesday. Okay. Every Tuesday is Thursday? Correct me if I'm wrong. I believe it's every Tuesday. And then every other weekend? Yes, I believe so. You have to understand, too, that these people live in the same community. It's a community that has acreage. Each home has acreage. And they live on the opposite end. So these kids come and go. And, in fact, the older child, which is not an issue here, but I know that's been brought up, so I'm going to address it, lived with Bruce. The 18-year-old. The 18-year-old. And these kids come and go. They go back and forth. They don't live where they have to get in an automobile and go. And to go back, he has been an active father. He has taken steps, so he is there. And I disagree, and my brief points this out, with the position that he missed 87 of 93 events. My brief actually addresses that. You know, you're talking about the girls on the run with practices and this. And even Mom wasn't there at those. So that is extremely misleading, and I think I've addressed that in my brief. To continue as to Judge Coriel's order, I do practice in front of him. And I think Mr. Reed said he hasn't. He doesn't know. He's a conscientious judge. He knows the law, and he rules from the bench. Unless you give him a case, or if he needs to review something, he'll say, I'll read the case and I'll take it under advisement. But if you give him the case in advance, he'll read it at any one of the breaks, and he will say, I've reviewed the case law. You look at this order. I want to get back to where I was arguing, if I've answered your question. You talk about the move may enhance petitioner's quality of life, but not the children's. I think Mr. Reed argued that that's against Collingborn. I don't believe that's against Collingborn. I think what we have is what is in the best interest for the children. And there are briefs, both the reply and appellate's brief, and the argument is, it's constantly, what is in Lori? You know, Lori wants to go up there. Lori's family. There's no doubt indirect benefit is something to consider. I agree with that. But I think in this case, all you have, all you have is mom's remarried, mom wants to go up there, and therefore, that's an indirect benefit, and I should go. There's more to it than that. Let's look at these kids. Let's look at the stability they've enjoyed all their lives. Wonderful grades. And the argument is, well, she's the day-to-day caretaker, and it's because of that that they get good grades. I totally disagree with that. I totally disagree with that. I think that helps. But Bruce's testimony is that he did help with some of the homework, and he certainly can now because he's not working the longer hours. If the court, and this is not an issue here, but if the court erred at all, it was denying our petition for a transfer of custody, and he ruled there was not a material change, and we didn't appeal it because that's true. There's not a material change. The reason I bring that up is I hear this punishment. We're punishing Lori because she's married to someone, and she can't move on with her life. And I know that there are a couple cases that say we should not subordinate the mother. You know, the father can move on with his life, and he can go anywhere, but mom can't. She's shackled in Illinois. That's just not true. That's just not true. Right before she remarried, she entered into an agreement that says it's in the best interest of the children to be here. Okay? And then she says, I fought for this wording currently or right now. Currently, yeah. I mean, when you sign an agreement, aren't we talking about currently? We're talking about right now. I don't see that that was a big negotiated issue here. And then shortly thereafter, some less than two years, I believe it's in my brief, oh, I've changed my mind. I want to go live up north now. I was there and did hear the testimony. I know, as Mr. Reed pointed out, I'm bouncing around a little too. You kind of get off your script a little bit. But his point was we, quote, we are forcing mom to stay in Illinois. No, we. We are not forcing anyone to stay in Illinois. That's not true. She can go to Wisconsin. Bruce also did a proposed order that reduced travel. And that's in the record. So they did work on that. And I think it can be done. But let's look at the best interest of these children again. This is the only home they've ever known. They're comfortable. They have stability. They have friends in the neighborhood. They have friends at school. They are getting good grades. They are well established. They have friends, adult friends with children in the neighborhood that they get together with. They have his mother who lives not far away over by Sullivan. I believe a brother. But they're a family here. Blood relatives, blood relatives. And I know one case mentions that, blood relatives. I think that's why I say it. Because I read it. So I don't know whether that's a big difference. But I read it in one of the cases, the blood relatives. We're not forcing her to stay here. We aren't shackling her here. She made this decision. And I want to focus on these children. Why are we going to force this move on these kids? They say, oh, they'll be traveling anyway. The testimony in court, I believe that they went once a month. And now they're in a car all the time. If you read the guardian ad litem's report, it also indicates that one of them gets car sick. And I don't remember which one it is, but one of them gets car sick. They hate to travel. Most of the visitation is going to be time traveling. And I think that that's not in the best interest. One of the issues, I think questions came up that her testimony about moving. I asked her those questions. I said, you're going to move up north in the Chicago area. Her testimony, I believe, was an emphatic yes. And whether she was thumbing the nose or not, Mr. Reed wasn't there. This court wasn't there. But she comes off as, what I want, I'm going to get. And whether that's relevant or not, how can it be? And they say, oh, that shows punishment towards Lori, whatever. No, no. You have to understand there were custody issues at bar here, too. Not just the removal. That's material change. It's a different standard. But who's to say that when he says it's not in the best interest and he says, I'm taken aback by this, it's not punishing. He's saying, my gosh, what kind of mother, considering her children, her young children's best interest, would up and move them up into the Chicago area, knowing no one, no family, no nothing? Isn't that something a Judge Correale could have considered best interest? I think so. I don't think it's punishment. I think Mr. Excuse me. I think Mr. I would like to go back to this order again. In paragraph one we talk about the children have lived in Forsyth or the Decatur area their entire lives. The schools are the only ones they've ever known. They're well adjusted. Have numerous friends. Perform well academically. Paternal grandmother resides in Rule, Sullivan a short distance away, as does a paternal uncle. Then you go on down. Activities in paragraph two. And I don't want to read it to you. I know you know what it says. The father in paragraph three was active. He was active. Judge Correale. You can't. It's hard to put yourself in a judge's place, an appellate judge, when he hears the evidence. He sees the demeanor of the witness. He looks and he can judge credibility. And I think the law is clear that you can't put yourself in the place of the evidence of the schools. We're no better in Wisconsin. In fact, I asked her, you never stepped foot in west of Pierce School District. She said no. She could have done that numerous times. She didn't. Paragraph six. Crime. Crime's not an issue. But that's certainly something that I think could be an accurate factor. So the court made its findings. Now, I also know from reading cases that he doesn't have to make findings on every piece of evidence he hears or every factor. In fact, this case didn't have, there was no issue with what is the father's motive for objecting to the move or the mother's motive. It wasn't an issue here. I think they're both good people. So the judge is not required to make findings on every little fact. The decision would be as long as the court record. I'd like to talk a little bit about the standard of review. The manifest way to the evidence. How can one rule that this was against the manifest way to the evidence and there was an abuse of discretion? I think the only way we can do that is you look and you say, is it unreasonable? Is it arbitrary? Was his decision not supported by any fact? Was a totally opposite decision clearly evident? I think those are what we look at. And clearly, I look at this case. There's one thing. Mom wants to go live in Wisconsin. She'll be happy. Therefore, it's in the best interest. I've read no case that says that. And if that's what we're going to find here, we have a statute. We have a statute that requires leave of court for removal. That statute, in my estimation, is to provide some type of protection from a non-custodial parent against someone who just wants to move and do away. Or, in essence, then cuts away at his visitation, his interaction with the children, etc. If we're going to say, and like I said, I've read no case that says, oh, if you want to move because you're remarried, then you get to move. If that's what the ruling is going to be, then I think it's going to have to be an exception to the removal statute. You have to carve an exception out of it. Because I think it, in essence, takes all the fight out of the statute. This woman painted herself into this corner. It's not we are forcing mom to move. No. No. And these kids don't want to go. These kids don't want to go. They like where they've been. I'd like to just refer again to page 3 of the reply brief of Mr. Reed. And just jot it down real quickly. Bruce makes a statement that Laurie's petition for removal is devoid of any factual basis to illustrate that the children's quality of life would be enhanced by her move to Wisconsin. Nothing could be further from the truth. In Moreau-Forsyth, Laurie is a single mother. Okay? Laurie. With no network or family support. We're not talking about the kids. We're talking about Laurie. Her current home is too large to maintain. Her. Laurie again. In Wisconsin, Laurie would go back to the town in which she was raised, wherein her extended family continues to reside. We're talking about Laurie again, not the best interest of the kids. We're talking about the best interest of Laurie. Again, she would live with her husband, who is from west of the pier, and who works there. She would live in one state, under one roof, rather than in Illinois in a separate household. Laurie would be happier as a result of living with her husband. Her happiness would allow her to enhance the quality of life of her children. In a nutshell, that's what this case is about. Laurie. Laurie. Laurie. What Laurie wants. Laurie. And then the last sentence. Well, and because Mama's happy, then the kids are going to be happy. I don't think that's what the law is. And I think to reverse Judge Correale, based on this record, and based on his findings, he made findings that were consistent with the case law. To say that she is being punished is inaccurate. That's what you argue when the facts are against you and the law is against you. I've been punished. I'm being discriminated against because I moved already. He's not liking what I did. Now, I don't think so. I think Judge Correale's ruling should be affirmed, and that's what we're asking. Thank you. Thank you, Mr. Ponto. Mr. Reed, any rebuttal? Your Honors, again, just briefly, but the first statement that he aptly argues to you is, we don't know what the court fully considered. Well, that's my whole point. We don't. And shouldn't we? Shouldn't we have a written opinion telling us what the court fully considered so that we can see if the court fully considered the things it was supposed to consider pursuant to Collingborn and all of the other cases before that? That's my point. And we can't separate Lori from the children. It's not Lori and the children. We can't sever that. The best interests are entwined and involved with the two of them. Everything's not about Lori. That's how I position my brief because that's who I represent and that's who I'm talking about. But when I say Lori's moved to Wisconsin, it's also the children's moved to Wisconsin. When you get a statement presented to you today that, well, what Lori wants she's going to get, well, can we really properly consider that? And I'm assuming that, well, I know the court won't consider that, but again, we're just trying to prejudice the court here, I think, with a statement like that. Nothing's further from the truth. This is a lady who takes care of every need of her kids and didn't ask to move until two years after she'd been married to this gentleman in Wisconsin. So nothing is further from the truth than what Lori wants Lori gets. And then I think, again, when the trial court takes the further step of discussing what is taken aback by Lori's statement about moving, well, she's not doing anything other than what the courts allow her to do. She can move anywhere in Illinois. A couple of these cases I was involved in, Means and Sightsinger, I was involved in both those cases where you were. Basically what the court said is you can move anywhere in Illinois, and if you've got to change visitation to adapt to Mom's move, then you've got to do it. And that's what Sightsinger and Means, one of which I lost, one of which I won, both say. But for the court to highlight that, to me, is an error. And for the court to make a statement that Mom's general quality of life has improved but not the kids and not to go on and say why the kids it hasn't improved, to me that's an error. So not only do we have factual circumstances here that I think are way in favor of allowing the move, but we also have statements made by the court that are clearly wrong in my mind. Anyway, those are the main things I'd like to highlight. And as was pointed out, the trial court denied a transfer of custody, so the custody is still with Mom. Mom's still the custodial parent. Let's give her deference and her determination to remarry and relocate that she is acting in the best interest of the kids, that she is acting in the best interest. She's made that determination as custodial parent, which she's been blessed with. And she's also acting in the best interest of the kids when she comes up with a reasonable and realistic visitation schedule so that it works for both sides. As Judge Pope pointed out, we're not talking about Massachusetts or Vermont or Utah or Colorado or a lot of these other places, Florida, that courts have allowed people to move. We're talking about Wisconsin. So I think with these facts and with the errors that I feel the trial court made in its ruling, that the court ought to reverse its decision. Thank you very much. Thank you, counsel. We'll take this matter under advisement and see you in recess.